# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br><br>v.<br><br>JAVIER MENDOZA-TRUJILLO, | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS**<br><br><br>Case No. 2:13-CR-762 DN<br><br>District Judge David Nuffer |

This order grants Javier Mendoza-Trujillo's Motion to Suppress.[1]  An evidentiary hearing was held on May 29-30, 2014.[2]  As directed, the parties submitted draft decisions.[3]  Argument was heard August 14, 2014.[4]  This Memorandum Decision and Order is entered after thorough review and consideration of the evidence presented, draft decisions and argument at the hearing.

### Table of Contents

Table of Contents ............................................................................................................. 1
FINDINGS OF FACT .......................................................................................................... 2
Incident and First Contact with Officers ....................................................................... 2
Transport to Police Station ............................................................................................ 4
Placement in Interview Room ........................................................................................ 6
First Interview Segment ................................................................................................. 6
Execution of Consent to Search Cell Phone ................................................................. 7
Bathroom Break ............................................................................................................. 10
Execution of Consent to Enter House for Cell Phone .................................................. 11
Execution of Third Consent Form ................................................................................. 13
In Forensics .................................................................................................................... 13
Execution of Fourth Consent Form ............................................................................... 14

---

[1] Docket No. 26, amended by Docket No. 41.

[2] Docket Nos. 52-53.

[3] Government's Proposed Findings of Fact and Conclusions of Law Re:  Defendant's Motion to Suppress, docket no. 60, filed July 7, 2014; (Defendant's proposed) Memorandum Decision and Order, docket no. 61, filed July 28, 2014.

[4] Minute Entry, docket no. 64, filed August 14, 2014.

Victim Advocates ............................................................................................................. 16
Search of the Home........................................................................................................... 17
Resumption of Interviews ................................................................................................ 18
DISCUSSION .......................................................................................................................... 19
I.   Mr. Mendoza-Trujillo Was Illegally Seized ................................................................ 20
     A.   Legal Framework................................................................................................. 20
     B.   Javier Mendoza-Trujillo Was Illegally Seized .................................................. 26
II.  No Break in the Chain of Events Validates the Consent Forms ................................... 32
     A.   The Consents to Search Were Executed in the Same Time Frame as the Illegal
     Seizure........................................................................................................................ 34
     B.   No Circumstance Intervened Between the Illegal Seizure and the Consent Form
     Signatures................................................................................................................... 34
     C.   The Purpose and Flagrancy of the Official Misconduct Show No Break ................. 35
III. Examined Independently of the Seizure, the Consents Were Not Voluntary ............... 37
     A.   Javier Was Not Informed of His Right to Refuse Consent........................................ 38
     B.   Javier Was Not Generally Cooperative ................................................................. 40
     C.   Coercive Tactics Were Used ................................................................................. 40
     D.   Other Factors Do Not Suggest Consent................................................................. 41
CONCLUSION........................................................................................................................ 42

# FINDINGS OF FACT

## Incident and First Contact with Officers

In the early morning hours of October 30, 2013, three armed men confronted Ismael

Mendoza-Trujillo in the driveway of his brother Javier's residence at 7133 West Chula Vista

Drive in West Valley City, Utah.[5]  One of the assailants, armed with an automatic pistol, entered

the house and went into the master bedroom where Maria del Socorro Mendoza-Trujillo (Javier's

wife) and two small children were lying down.[6]  Javier was in the bathroom at the time, brushing

his teeth.[7]  Ismael was still outside, fighting with the other two assailants.[8]  Ismael saw that one

of the armed men had entered the home.[9]  Ismael was able to get away from the other two men

---

[5] Transcript of evidentiary hearing on Motion to Suppress ("Transcript"), p.32, lines 16-19, p.257, lines 16-18, p.258, lines 6-15, docket nos. 56 and 63, filed June 12, 2014  and August 7, 2014, respectively.

[6] Transcript, p.32, lines 11-15, p.62, lines 1-2, p.212, lines 3-4, p.259, lines 13-14; Exhibit BB, p.17, lines 14-18.

[7] Exhibit BB, p.3, lines 11-15, p.18, lines 9-12; Transcript, p.62, line 3.

[8] Transcript, p.258, lines 9-25, p.259, line 1.

[9] Transcript, p. 17, lines 17-19.

that he was fighting with and ran into the house because he was fearful for his brother, Javier, and Maria and the children.[10]  Wearing only his sweatpants, Javier came out of the bathroom[11] to find the assailant pointing a pistol at his wife.[12]  Crying, Maria yelled for Javier and then jumped out of the bedroom window.[13]  Maria ran to the downstairs tenants, yelling and screaming to call 911.[14]

Javier and Ismael engaged the assailant, trying to wrestle away the pistol.[15]  Javier and Ismael fought the armed assailant for some time, somewhere between eight and 20 minutes,[16] ultimately disarming the assailant and immobilizing the assailant with a chokehold after tumbling down the stairs.[17]  The other two armed assailants never entered Javier's residence and ran away before the police arrived.[18]  Medical personnel were dispatched and took the armed assailant to the hospital, where the assailant was placed on life support, and dies from his injuries two days later.[19]  West Valley City police were dispatched, and officers began arriving at Javier's house around 5:30 in the morning.[20]

The first officers to arrive cleared the home, secured the scene, and made sure all of the adults, including Javier, were placed in a common area with an instruction not to talk to each

---

[10] Transcript p. 17, lines 12-23; Transcript, p. 48, lines 2-17; Transcript p. 258, line 24 – p. 259, line 4.

[11] Transcript, p.278, lines21-25, p.279, lines 1-5.

[12] Exhibit BB, p.3, lines 15-16, p. 4, lines 1-3.

[13] Transcript, p.62, lines 7-8, p.212, lines 16-18; Exhibit BB, p.18, lines 16-22.

[14] Transcript, p.41, lines 12-13, p.62, lines 8-10, p.212, lines 13-15.

[15] Exhibit BB, p.4, lines 10-23.

[16] Exhibit BB, p.6, lines 21-23; Transcript, p.50, lines 12-14, p.260, line 18.

[17] Exhibit BB, p. 8, lines 21-25, p.20, lines 4-10, p.22, lines 11-25, p.23 , lines 1-2; Transcript, p.259, line 22.

[18] Transcript, p.18, lines 14-16, p.258, lines 9-16, p.259, lines 1-2.

[19] Transcript, p. 1824-25, p.19, lines 1-8, p.42, lines 3-9.

[20] Transcript, p.201, lines 4-10

other.[21]  Eventually, detectives with Critical Incidents and the Major Crimes response team were dispatched, arriving between 6:30-6:45 a.m..[22]  Detective Pittman arrived at 7:10.[23]

The Major Crimes detective, Detective Stanworth, testified to the proper protocol when responding to a home invasion type of crime where one party is seriously injured:[24] the scene must be secured, the scene must be processed for forensic evidence, and the involved parties need to be interviewed.[25]  Detective Stanworth further testified it is common practice to conduct interviews at the police station in major cases.[26]  This way, he said, the scene can be properly processed and the interviews can be recorded, both audio and video.[27]

At the time Javier's house was being processed by the forensics team, the focus of the police investigation was to ascertain who the two escaping assailants were, who the injured assailant was, and simply to determine what had just happened.[28]

**Transport to Police Station**

The five adults (Javier, Ismael, Maria, and the two tenants in the basement apartment) were told they needed to go to the police station.[29]  Detective Stanworth testified that he could not  "necessarily say what these individuals were told, but in this situation we just tell them that due to the nature of the crime we need to interview them in a more formal setting so that the interview is recorded so that we can have a good account of the interview."[30]  In response to a

---

[21] Transcript, p.201, lines 17-25, p.202, lines 1-6.

[22] Transcript, p.16, lines 15-25, p.36, lines 21-25, p.98, lines 13-15.

[23] Transcript, p.138, lines 12-16.

[24] Transcript, p.16, lines 23-25.

[25] Transcript, p.19, lines 15-18, p.20, lines 1-13.

[26] Transcript, p.23, lines 11-12.

[27] Transcript, p.23, lines 13-19.

[28] Transcript, p.20, lines 19-25.

[29] Transcript, p.29, lines 7-10.

[30] Transcript, p. 24, line 24 to p. 25, line3.

question whether they "agreed" to come to the station and submit to an interview, he stated that he "was not made aware of any complaints or hesitation on their part to come to the station."[31] However, Javier testified that he specifically asked if he had to go to the police station, and was told it was necessary for him to do it (go to the station for the interview).[32] And Detective Pittman testified he was assigned to explain to Javier and others "that they need to go back to the police station to talk to us . . . ."[33] Thus, Detective Stanworth, Detective Pittman and Javier concur that the officers described the change of location as "necessary." No one testified that options were presented.

Javier was taken to the police station by Officer Cowan.[34] Javier was placed in the back seat, behind the cage, in Officer Cowan's vehicle.[35] The back doors of Officer's Cowan's vehicle cannot be opened from the inside.[36] Prior to leaving the house, but after placing Javier behind the cage, Officer Cowan asked Javier if he had his driver's license.[37] Javier did not have his license with him. Officer Cowan left Javier in the back seat, went to the house, and acquired Javier's ID from another officer.[38]

Upon arriving at the police station, all five adults were kept separated to prevent their respective testimony from being tainted by someone else's perception.[39] At the time Javier was taken to the police station, Detective Stanworth said Javier was not viewed as a suspect but

---

[31] Transcript, p. 25, lines 4-7.

[32] Transcript, p.281, lines 22-25, p.282, line 1.

[33] Transcript, p. 39, lines 5-6. *See also* Transcript, p.44, lines 2-6.

[34] Transcript, p.203, lines 20-22.

[35] Transcript, p.204, lines 11-16.

[36] Transcript, p.204, lines 17-21c.

[37] Transcript, p.205, lines 1-7.

[38] Transcript, p.205, lines 10-15.

[39] Transcript, p.24, lines 1-7.

rather viewed strictly as a victim.[40]  Detective Pittman was asked to interview Javier, Ismael, and Maria, because he was one of three Spanish-speaking detectives with West Valley City police and the individuals were more comfortable speaking in Spanish.[41]

**Placement in Interview Room**

Javier arrived at the West Valley City police station at 7:58 a.m.[42]  Javier was put into an interview room sometime before 9:07 a.m. when video recording began,[43] and not moved from the interview room until taken to forensics for fingerprints, DNA, and photographs.[44]  Javier sat alone in the interview room for nearly 90 minutes, watched by someone in the viewing room.[45]  Once inside the police station, all five of the adults, including Javier, needed permission to walk around, use the restroom, or otherwise leave the interview room.[46]

**First Interview Segment**

Detective Pittman testified his original intent when he started interviewing Javier was for the purpose of investigating the home invasion robbery.[47]  Detective Pittman said that when he began his interview of Javier "there was no speculation of drugs."[48]  Detective Pittman began interviewing Javier at 10:32 a.m.[49] by stating "I want you to tell me from the beginning to end

---

[40] Transcript, p.25, lines 8-18, p.43, lines 1-8.

[41] Transcript, p.26, lines 6-8, p.38, lines 3-5.

[42] Transcript, p.310, line 11.

[43] The video recording is Exhibit AA.  It has captions in English. The transcript of the video in English is Exhibit BB.  The times on the video are different than the times indicated on the paper exhibits as evidenced by comparing the documents and the video time-stamp.  Detective Pittman explained the anachronism between the documents and the video, as Detective Pittman used his iPhone for the time.  Transcript, p.95, lines 17-25, p. 96, lines 1-25, p.97, lines 1-7.

[44] Transcript, p.60, lines 2-4.

[45] Exhibit AA; Transcript, p.45, lines 17-24.

[46] Transcript, p.30, lines 3-5, p.207, line 25, p.208, lines 1-3, p.225, lines 22-25, p.226, line 1, p.252, lines 19-25, p.253, lines 1-4, p.264, lines 16-25, p.265, lines 1-8, p.282, lines 24-25, p.283, line 1.

[47] Transcript, p.68, lines 8-10.

[48] Transcript, p.137, lines 3-4.

[49] Exhibit AA-1.

everything that happened.  You can start wherever you want, and tell me everything that happened complete.  Don't give me lies, everything that happened."[50]  Javier explained the home invasion and the ensuing fight between the armed assailant, himself, and Ismael.[51]  Despite being asked several times why the attack occurred, Javier consistently answered he did not know.[52]

Detective Pittman refused to believe this was simply a random home robbery, stating his personal belief the armed assailant "was looking for something."[53]  Detective Pittman said that he would not investigate if Javier was doing "something illegal."[54]  After listing a litany of possibilities as to why Javier's residence was targeted, Detective Pittman expressed his disbelief in Javier's version,[55] telling Javier "I just want to know the truth.  Why were they there?  And I know you know why they were there."[56]  Detective Pittman held fast to his belief that Javier was lying, yelling at Javier to "[t]ell me the truth!"[57]  Javier's response was equally as vehement "That is the truth!"[58]

**Execution of Consent to Search Cell Phone**

After a discussion about Javier's wallet, how Detective Pittman was paid by check and not in cash, and whether or not Javier had contraband in his house,[59] Detective Pittman asked Javier if he had his cell phone with him.[60]  Detective Pittman then asked Javier if Javier used his

---

[50] Exhibit AA, 10:33:05-25, 153847-154453, 01:25:34-54; Exhibit BB, p.2, lines 23-25, p.3, lines 1-2.

[51] Exhibit BB, pp.3-11, pp.13-16, pp. 22-23.

[52] Exhibit BB, p.28, lines 16-20, p.38, line 14.

[53] Exhibit AA, 10:57:37-58:01, 197970-198692, 1:50:06-30; Exhibit BB, p.27, lines 12-13.

[54] Exhibit AA, 10:57:37-58:01, 197970-198692, 1:50:06-30; Exhibit BB, p.27, lines 14-15.

[55] Exhibit AA, 10:59:45, 201810, 01:52:14; Exhibit BB, p.28, line 22.

[56] Exhibit AA, 10:59:34-68, 501464-589, 1:52:02-07; Exhibit BB, p.28, lines 15-17.  See also Exhibit BB, p.29, lines 21-24, p.30, lines 9-10.

[57] Exhibit AA, 11:01:53-56, 205637-748, 01:54:22-25; Exhibit BB, p.30, line 9, p.31, line 9.

[58] Exhibit AA, 11:01:53-56, 205637-748, 01:54:22-25; Exhibit BB, p.30, line 10, p.31, line 10.

[59] Exhibit AA, 11:01:56-04:17, 205748-209974, 01:54:24-56:46; Exhibit BB, p.30, lines 11-25, p.31, lines 1-3.

[60] Exhibit AA, 11:04:23, 210149, 01:56:52; Exhibit BB, p.32, lines 21-23.

"cell phone after all this happened?"[61] Javier responded "no,"[62] as he was only wearing

sweatpants when all this happened.[63] Since Javier's son may have used Javier's phone to take a

photo of the armed assailant,[64] Detective Pittman told Javier he wanted "two things. First, I want

to get the information off your cell phone like that picture or a text or a history of the calls,

things like that so I can verify if you are telling me the truth."[65] Detective Pittman told Javier it

was possible "to say no."[66] In response, Javier asked if he was going to be arrested for hitting

the armed assailant.[67]

> Q.    Okay. I want -- what I want to do is two things. First I want to get the information
>        off your cell phone like that picture or a text or a history of the calls, things like
>        that so I can verify if you are telling me the truth. Okay, of this case.
> A.    Yes.
> Q.    Can I do it? You can say no to me. I'm just asking you permission to do it.
> A.    Okay.
> Q.    Can I do it?
> A.    Like all this, are you going to arrest me for having hit him?
> Q.    No, no, no, no. You are a victim. Why would I arrest?[68]

Detective Pittman told Javier "No, no, no, no. You are a victim."[69] Javier was not

pacified. Javier stated, with interruptions by Detective Pittman, "I feel like – like if I have done

something wrong, and that's why you have to arrest me."[70] Although the issues of texts or calls

had not been broached in the interview at the time, Detective Pittman stressed his need to verify

---

[61] Exhibit AA, 11:04:29, 210308, 01:56:57; Exhibit BB, p.32, lines 24-25.

[62] Exhibit AA, 11:04:29-34, 210328-462, 01:56:58-57:03; Exhibit BB, p.33, line 1.

[63] Exhibit AA, 11:04:29-34, 210328-462, 01:56:58-57:03; Exhibit BB, p.33, line 3.

[64] Exhibit AA, 11:04:39-45, 210618-797, 01:57:08-14; Exhibit BB, p.33, lines 6-12.

[65] Exhibit AA, 11:05:04-31, 211358-212164, 01:57:33-59; Exhibit BB, p.33, lines 17-21.

[66] Exhibit AA, 11:05:26, 212016, 01:57:54; Exhibit BB, p.33, lines 23-25.

[67] Exhibit AA, 11:05:34, 212281, 01:58:03; Exhibit BB, p.34, lines 2-3.

[68] Exhibit BB, p. 33, lines 17-25, p. 34, lines 1-5.

[69] Exhibit AA, 11:05:38, 323396, 01:58:07; Exhibit BB, p.34, line 4.

[70] Exhibit AA, 11:05:50, 212743, 01:58:19; Exhibit BB, p.34, lines 8-11.

what Javier told him and the need to see inside Javier's cell phone.[71]  The following exchange took place:[72]

> Q (Pittman):   Also, I have to verify what you told me, so then one of those verifications is I want to see inside your cell phone to see if have the picture.  I want this picture.  And you told me that you never made a call after.  I want to verify that.  I want to verify that you didn't do a text or made any calls saying, hey, I hit this guy and I was going to kill him or something like that.
>
> I want to verify because when we go to court, that guy, I want to talk to the judge to tell, no, he told me the truth.  He told me he didn't do a text, and there is not a text.  He told me he didn't do a phone call, and there is not a call.  He told me that he took a picture and, yes, there was a picture.  Well, okay.  Is that fine?
>
> A (Javier):      But right now what are you going to do with me?  Are you detaining me?
> Q:        You?
> A:        Uh-huh.
> Q:        Once we finished talking, you can go back to your house.
> A:        But I do feel like if I were –

Detective Pittman continued to interview Javier, asking why Javier was the victim of this home invasion.[73]  Detective Pittman claimed, based on his experience, "every investigation that I have done about drugs or money, every one."[74]  Pressing Javier, Detective Pittman repeated "I want to know why these guys were there."[75]  Javier repeated "I don't know."[76]

Detective Pittman returned to the issue of the phone, repeating his request for Javier's consent to "look inside your cell phone for pictures to see if you did texts or made any calls after."[77]  Javier agreed.[78]  Detective Pittman then gathered specific information about Javier's phone,[79] ultimately learning that the photo was taken using Javier's wife's (Maria's) phone.[80]

---

[71] Exhibit AA, 11:05:52-07:13, 212807-215220, 01:58:21-59:41; Exhibit BB, p.34, lines 19-25, p.35, lines 1-8.

[72] Exhibit AA, 11:05:52-07:27, 212807-215657, 01:58:21-59:59; Exhibit BB, p.34, lines 19-25, p.35, lines 1-15.

[73] Exhibit BB, p.35-38.

[74] Exhibit AA, 11:12:11, 224175, 02:04:40; Exhibit BB, p.38, lines 4-5.

[75] Exhibit AA, 11:12:44, 225169, 02:05:13; Exhibit BB, p. 38, lines 12-13.

[76] Exhibit AA, 11:12:48, 225265, 02:05:17; Exhibit BB, p.38, line 14.

[77] Exhibit AA, 11:12:55-13:02, 225477-225700, 02:05:24-31; Exhibit BB, p.38, lines 15-18.

[78] Exhibit AA, 11:13:04, 225741, 02:05:32; Exhibit BB, p.38, line 19.

[79] Exhibit BB, p.38, lines 20-25, p.39, lines 1-23.

Nonetheless, Detective Pittman filled out the consent to search form to look for "texts or for data or for pictures and for the call history"[81] on Javier's phone.

Detective Pittman then had Javier complete specific lines[82] on the West Valley City Police Department Consent to Search form[83] while continuing to talk with Javier about the case.[84] Detective Pittman did not translate the form from English to Spanish.[85] Detective Pittman did not explain to Javier that he (Javier) had a constitutional right to refuse or withhold consent.[86]

The consent form was executed at 1133.[87] After signing the form as instructed by Detective Pittman, Javier inquired as to the whereabouts of his son,[88] and then requested to use the bathroom.[89]

**Bathroom Break**

Detective Pittman told Javier he could use the restroom, and then stepped out of the room.[90] The video counter shows the time Detective Pittman left the room to be approximately 11:18:17.[91] An officer escorted Javier to and from the bathroom.[92] Detective Pittman reentered

---

[80] Exhibit BB, p.40, lines 4-6.

[81] Exhibit AA, 11:15:00-22, 229242-899, 02:0729-51; Exhibit BB, p.40, lines 6-8;Transcript, p.40, lines 7-8.

[82] Exhibit AA, 11:15:32, 230200, 02:08:01; Exhibit BB, p.40, lines 8-9; Exhibit AA, 11:16:59, 232811, 02:09:28; Exhibit BB, p.41, lines 9-11.

[83] Exhibit 1; Transcript, p.74, line 25, p.75, lines 1-13.

[84] Exhibit BB, p.40, lines 10-25, p.41, lines 1-9, 13-25.

[85] Exhibit AA.

[86] *Id*.

[87] Exhibit 1. *See n. 43, supra,* for an explanation of this different time format.

[88] Exhibit AA, 11:17:48-18:21, 234276-235245, 02:10:17-50; Exhibit BB, p.41, lines 13-20.

[89] Exhibit AA, 11:18:22-25, 235277-362, 02:10:51-53; Exhibit BB, p.41, lines 21-25.

[90] Exhibit AA, 11:18:22-25, 235277-362, 02:10:51-53; Exhibit BB, p.41, lines 23-25.

[91] Exhibit AA-1.

[92] Transcript, p.71, lines 4-12.

the interview room at approximately 11:22:45[93] to ask Javier his cell phone number.[94]  The number Javier gave Detective Pittman was not the same as the number Detective Pittman wrote on the Consent to Search form.[95]  Detective Pittman left the interview room at approximately 11:24:33.[96]

**Execution of Consent to Enter House for Cell Phone**

Detective Pittman reentered the interview room at approximately 12:31:41.[97]  He told Javier there were not "any detectives at your house right now"[98] and said he wanted permission to enter Javier's house to look for the cell phone.[99]

The statement about the absence of officers at the home is inconsistent with the other facts developed at the hearing.  Detective Sean McCarthy received a call around 10:00-10:15 a.m. and he arrived at Javier's residence around 11:00 a.m.[100]  Detective Averett was already at Javier's residence when Detective McCarthy arrived.[101]  Detective McCarthy sat outside Javier's residence until around 3:00 p.m.[102]  However, the downstairs tenant noted that seven to ten officers were inside the house.[103]

---

[93] Exhibit AA-1.

[94] Exhibit BB, p.42, lines 2-12.

[95] Exhibit 1; Exhibit BB, p.42, line 11.

[96] Exhibit AA-1.

[97] Exhibit AA-1.

[98] Exhibit AA, 12:31:52, 367462, 03:24:21; Exhibit BB, p.43, lines 11-12.

[99] Exhibit AA, 12:31:52-32:08, 367462-926, 03:24:21-37; Exhibit BB, p.43, lines 12-15; Transcript, p.75, lines 23-25, p.76, lines 1-3.

[100] Transcript, p.147, lines 14-15.

[101] Transcript, p.147, lines 18-24.

[102] Transcript, p.150, lines 2-3.

[103] Transcript, p.253, lines 16-23.

In answer to Detective Pittman's request to enter the house to look for the cell phone, Javier repeatedly responded "whatever you want."[104]  After Detective Pittman repeated his request to enter Javier's house, Javier said "Yeah, that's fine.  How much longer I'm going to be here?"[105]  Detective Pittman replied "I hope not much longer.  I think maybe 30 minutes or an hour or so or maybe more than that."[106]

Javier asked then about a drink of water, photographing his injuries, and food.[107]  Detective Pittman chuckled, replying that he had not eaten either.[108]  Detective Pittman then presented Javier with another Consent to Search form, claiming the search will be limited to the bedroom for the purposes of finding Javier's phone.[109]  The form does not specify the master bedroom.  It states consent to search "7133 W Chula Dr, Cell phon" was voluntarily given.[110]  Detective Pittman told Javier "[l]ike I explained to you before, you can put your name, your date of birth, and your signature"[111] on the form.  The second Consent to Search was executed at 1251.[112]

Javier mentioned wanting to take a shower, and wanted to know if Detective Pittman would be taking him home, or if someone else needed to be called.[113]  Rather than answer yes or

---

[104] Exhibit AA, 12:32:34-57, 368712-369414, 03:25:03-26; Exhibit BB, p.44, lines 3-4, line 12.

[105] Exhibit AA, 12:33:13, 369897, 03:25:42; Exhibit BB, p.44, lines 17-18.

[106] Exhibit AA, 12:33:17-21, 369993-370114, 03:25:45-50; Exhibit BB, p. 44, lines 19-21.

[107] Exhibit AA, 12:33:32-34:06, 370466-371463, 03:26:01-35; Exhibit BB, p.44, lines 24-25, p.45, lines 1-9; Transcript, p.130, lines 21-25, p.131, lines 1-5.

[108] Exhibit AA, 12:34:08-10, 371547-868, 03:26:38-48; Exhibit BB, p.45, lines 10-13.

[109] Exhibit BB, p.45, lines 19-20.

[110] Exhibit 2.

[111] Exhibit AA, 12:35:00, 373092, 03:27:29; Exhibit BB, p.45, lines 17-18.

[112] Exhibit 2.

[113] Exhibit AA, 12:35:27-45, 373914-374451, 03:27:56-28:14; Exhibit BB, p.46, line 1-5.

no, Detective Pittman stated "[w]hen you are finished here, you can go back to your house."[114] Javier asksd about his children.[115]  Detective Pittman left the room at approximately 12:36:26.[116]

**Execution of Third Consent Form**

Detective Pittman reentered the interview room at approximately 13:11:40.[117]  Detective Pittman explained he needed a DNA sample and fingerprints from Javier.[118]  With a third Consent to Search form,[119] Detective Pittman told Javier to write his name, date of birth, and signature.[120]  This Consent to Search form was executed at 1331.[121]  Detective Pittman asked Javier if he was okay, needed to use the bathroom, or needed water.[122]

Javier had asked for water earlier,[123] but Detective Pittman had forgotten.[124]  Detective Pittman left the interview room at approximately 13:16:13,[125] and reentered the interview room with water at approximately 13:18:48.[126]

**In Forensics**

At approximately 13:21:57,[127] Detective Pittman removed Javier from the witness room for the purpose of taking Javier to forensics for fingerprints, obtaining a DNA sample, and

---

[114] Exhibit AA, 12:35:48, 374521, 03:28:17; Exhibit BB, p.46, lines 6-7.

[115] Exhibit AA, 12:35:51-36:16, 374620-375376, 03:28:20-45; Exhibit BB, p.46, lines 8-16.

[116] Exhibit AA-1.

[117] Exhibit AA-1.

[118] Exhibit AA, 13:12:44-13:43, 440965-442725, 04:05:14-06:12; Exhibit BB, p.47, lines 16-25, p.48, lines 1-19; Transcript, p.77, lines 10-13.

[119] Exhibit 3.

[120] Exhibit AA, 13:14:55, 444881, 04:07:24;Exhibit BB, p.48, line 25, p.49, line 1.

[121] Exhibit 3.

[122] Exhibit AA, 13:15:43-16:13, 446329-447208, 04:08:13-42; Exhibit BB, p.49, lines 8-9.

[123] Exhibit BB, p.44, lines 24-25.

[124] Exhibit AA, 13:15:43-16:13, 446329-447208, 04:08:13-42; Exhibit BB, p.49, lines 11-12.

[125] Exhibit AA-1.

[126] Exhibit AA-1.

[127] Exhibit AA-1.

photographing Javier's injuries.[128]  Javier, Ismael, and Maria were taken to forensics together,[129] although kept separated.[130]  The conversations that occurred in forensics and the execution of the fourth consent to search were not recorded.[131]

While waiting for the fingerprints, DNA sample and photographs, Detective Pittman kept talking to Javier, "again, talking about why he thought someone would break into his residence and rob him."[132]  Javier "kept on telling" Detective Pittman "he didn't know, that he would like to know, also."[133]  Detective Pittman did not believe the home invasion was "just a random act."[134]  Instead, Detective Pittman believed the home invasion was "for a specific reason, to take or to, it could have been a debt, Javier owed them money, there could be something.  He could keep large quantities of cash in his house.  It's unknown, and [Detective Pittman] wanted to know why these people picked [Javier's] residence."[135]  Detective Pittman "continued to talk to Javier in regards to why these people broke in.  I keep saying people.  These suspects broke into his residence, why they broke into his residence.  It was a continuation of talking to Javier in that aspect of the case."[136]

**Execution of Fourth Consent Form**

As a result of Detective Pittman's continuing interview of Javier at forensics, a fourth consent to search was presented.[137]  By this point in time, Detective Pittman had spoken with

---

[128] Exhibit BB, p.49, lines 17-24.

[129] Transcript, p.127, lines 7-8, 18-24.

[130] Transcript, p.58, lines 17-19.

[131] Transcript, p.81, lines 24-25, p.82, lines 1-4.

[132] Transcript, p.80, lines 8-10.

[133] Transcript, p.80, lines 12-13.

[134] Transcript, p.80, line 15.

[135] Transcript, p.80, lines 15-20.

[136] Transcript, p.82, lines 7-11.

[137] Transcript, p.79, lines 21-24, p.82, lines 5-12.

Detective Dowland about the investigation of drugs.[138]  Detective Dowland had asked Detective

Pittman to obtain this fourth consent to search to get into Javier's house to look for "the

speculation there might be – or the reason behind why the robbery took place,"[139] such as "the

drugs and the money."[140]

     This fourth consent to search asked for Javier's permission to search Javier's residence

for a cell phone, items used in the assault, drugs, and money.[141]  This consent to search was not

read to Javier,[142] nor was it translated from English to Spanish and explained.[143]  Javier was not

told he could refuse to sign the fourth consent to search.[144]  In fact, the only time Detective

Pittman told Javier he could say no to a request to search was early in the discussion of the first

consent to search.[145]

     Javier testified that prior to signing the fourth consent to search, he asked to speak to an

attorney.[146]  Javier said that Detective Pittman told Javier an attorney was not needed because

Javier was the victim and was not being arrested.[147]  In contrast, Detective Pittman testified that

Javier did not raise the issue of an attorney[148] and that he, Detective Pittman, did not mention an

attorney when this form was signed.[149] [150]  Detective Pittman did not testify as to what he told

---

[138] Transcript, p.122, lines 8-11.

[139] Transcript, p.122, lines 24-25.

[140] Transcript, p.122, lines 12-17, p.137, lines 6-12.

[141] Exhibit 4; Transcript, p.80, lines 23-25, p.81, lines 4-5.

[142] Transcript, p.283, lines 20-22.

[143] Transcript, p.283, lines 23-25.

[144] Transcript, p.284, lines 1-3.

[145] Transcript, p.289, lines 15-23; Exhibit BB, p.33, line 23.

[146] Transcript, p.284, lines 17-19.

[147] Transcript, p.284, lines 20-23, p. 296, lines 12-18.

[148] Transcript, p. 363, lines 23-25; p. 364, lines 16-17.

[149] Transcript, p. 364, lines 11-15.

[150]

Javier about counsel, just as to what he would say if a person in Javier's position raised the issue of an attorney.[151] Javier's version of the facts is more credible.

At the time Detective Pittman had Javier execute the fourth consent to search, he (Detective Pittman) did not have any information that drugs or large amounts of currency were at Javier's residence.[152] Detective Pittman did not gain this information (the presence of drugs or large amounts of currency) until after Javier's house was searched.[153] The consent to search was executed at 1405.[154]

After Javier filled out the fourth consent to search, Detective Pittman handed the consent form to Detective Dowland, who was also inside the forensics area[155] and in charge of the drug investigation.[156] When Detective Dowland received the consent forms, Javier had not had his fingerprints taken, the DNA swab done, and photographs were not yet taken of his injuries.[157]

Detective Dowland and others were going to perform the "consent search to retrieve the phone and look for other evidence in the assault and for the motive behind the home invasion being possibly drugs, money, or whatever else, whatever reason it was for the home invasion."[158]

**Victim Advocates**

After Javier had been processed at forensics, Detective Pittman offered to walk Javier, Ismael, and Maria to the victim advocates.[159] At that instant, Detective Pittman testified the

---

[151]

[152] Transcript, p.137, lines 6-11.

[153] Transcript, p.137, lines 12-14.

[154] Exhibit 4; Transcript, p.137, lines 10-12.

[155] Transcript, p.82, lines 23-25, p.83, lines 1-2.

[156] Transcript, p.119, lines 20-23.

[157] Transcript, p.83, lines 16-21.

[158] Transcript, p.83, lines 4-8.

[159] Transcript, p.84, 12-25, p. 85, lines 1-6.

three were free to leave.[160]  They did not have to talk with victim advocates – if they wanted to leave, Detective Pittman offered to drive them somewhere, they could have found their own ride, or Detective Pittman was going to provide a phone so they could call someone.[161]

**Search of the Home**

Around 3:00 p.m., Detective Dowland and Lieutenant McClennon arrived at Javier's residence.[162]  They informed Detective McCarthy that consent to search the residence had been obtained.[163]  Detective McCarthy was not shown a copy of the consent to search form.[164] Entering through the unlocked front door, the three police officers went to the master bedroom and began to search.[165]  At that time, Detective McCarthy had been told "some sort of home invasion robbery had occurred,"[166] and that based on the interviews at the police station, "[i]t wasn't a random act of violence.  The belief was that there was something illegal in the master bedroom."[167]  The three began to search the bedroom for illegal items, including finding items of drug packaging materials behind the headboard and large amounts of currency in the closet within a few minutes of starting the search.[168]  Upon finding the items, the officers stopped searching.[169]  Detective McCarthy was requested to write a search warrant for the residence, using the kitchen table to type the affidavit.[170]

---

[160] Transcript, p.86, lines 8-14.

[161] Transcript, p.86, lines 15-17.

[162] Transcript, p.150, lines 7-9.

[163] Transcript, p.150, lines 9-10.

[164] Transcript, p.150, lines 11-12.

[165] Transcript, p.150, lines 22-25, p.151, lines 1-4.

[166] Transcript, p.151, lines 8-10.

[167] Transcript, p.151, lines 11-15.

[168] Transcript, p.151, lines 21-25.

[169] Transcript, p.152, lines 4-6.

[170] Transcript, p.152, lines 6-14.

**Resumption of Interviews**

Approximately ten (10) minutes after Detective Pittman left Javier, Ismael, and Maria with the victim advocates, Detective Pittman received a phone call from Detective Dowland.[171] Detective Dowland reported drugs had been located inside Javier's residence.[172] Detective Dowland asked Detective Pittman to find Javier and bring him back to the interview room.[173] Detective Pittman did as requested, going to the victim advocates office, and asking if Javier was still there.[174] Javier, Ismael, and Maria were still there, never having left the police station. Detective Pittman took all three back to where they were initially interviewed, returning Javier to the interview room.[175] When Javier was returned to the interview room, the recording began again, starting at approximately 14:15:42.[176]

Detective Pittman told Javier "the other detectives . . . called . . . and they said that they found things; drugs, money inside the clothes here in the house."[177] Detective Pittman then asked Javier "Do you want to cooperate and talk to me about that?"[178] Javier responded "I am addicted to cocaine."[179] Detective Pittman expressed disbelief or inability to hear, and Javier repeated his statement about being addicted to cocaine.[180] Following Javier's statements about

---

[171] Transcript, p.88, lines 20-21.

[172] Transcript, p.88, lines 22-23.

[173] Transcript, p.89, lines 4-6.

[174] Transcript, p.89, lines 9-13.

[175] Transcript, p.89, lines 17-21, p.90, lines 3-4.

[176] Exhibit AA-1; Transcript, p.90, lines 5-7.

[177] Exhibit BB, p.50, lines 4-7; Transcript, p.90, lines 10-12.

[178] Exhibit BB, p.50, lines 12-13.

[179] Exhibit BB, p.50, line 14; Transcript, p.90, line 12.

[180] Exhibit BB, p.50, lines 15-18.

cocaine, Detective Pittman explained Javier's rights.[181]  Detective Pittman then asked if Javier wanted to continue talking.[182]  Javier asked for his attorney.[183]

Detective Pittman then left the interview room at 14:54:22.[184]  After some time passed, Javier asked to use the restroom.[185]  Detective Pittman reminded Javier of his request for an attorney, and repeated the *Miranda* warning, asking Javier if he understood his rights.[186]  Javier said he understood, but continued talking to Detective Pittman.[187]  It was somewhere between 7:00 p.m. and 9:00 p.m. that Javier and Detective Pittman talked outside of the interview room.[188]  Javier had not been given anything to eat – Javier did not get any food until 10:30 or 11 o'clock at night.[189]


### DISCUSSION

This order finds that Mr. Mendoza-Trujillo was illegally seized and held in custody, and that all evidence which was obtained as a result of that illegal seizure must be suppressed, including evidence obtained from searches which were conducted based upon consent given during and as a result of the illegal seizures.  The legal conclusions regarding voluntariness of the consent forms are provided in the alternative.

---

[181] Exhibit BB, p. 50, lines 19-25, p.51, lines 1-2; Transcript, p.90, lines 13-14.

[182] Exhibit BB, p.51, lines 3-4.

[183] Exhibit BB, p.51, line 5; Transcript, p.90, lines 16-19.

[184] Exhibit AA-1; Exhibit BB, p.51, line 19; Transcript p.90, lines 21-22.

[185] Exhibit BB, p.51, line 21.

[186] Transcript, p.92, lines 5-9.

[187] Transcript, p.92, lines 10-12.

[188] Transcript, p.93, lines1-4, p.94, line 1.

[189] Transcript, p.130, lines 11-22.

## I.    Mr. Mendoza-Trujillo Was Illegally Seized

### A.    Legal Framework

The Fourth Amendment protects "the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[190]  The Fourth Amendment serves to protect individuals against "*unreasonable* searches and seizures."[191]

Whether "a person has been seized within the meaning of the Fourth Amendment"[192] is based upon the totality of the circumstances.  Only if, in light of all of the factors surrounding the event in question, "a reasonable person would have believed that he was not free to leave,"[193] can it be said that the police seized a person within the meaning of the Fourth Amendment. Stated differently, "[s]o long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual."[194]  In light of the circumstances surrounding the police encounter, the key question to determine whether a person has been seized is whether "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."[195]

Prior to *Terry*, seizures of persons were analyzed in terms of arrest, for which "the requirement of probable cause…was treated as absolute."[196]  The holding in *Terry* and

---

[190] *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation omitted).

[191] *United States v. Sharpe*, 470 U.S. 675, 682 (1985).

[192] *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

[193] *Id.*

[194] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[195] *Id.* at 437 (quotation omitted); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

[196] *Dunaway v. New York*, 442 U.S. 200, 208 (1978).

subsequent cases carved out exceptions to the Fourth Amendment's prohibition on government intrusion into personal security.[197]

Beyond narrowly defined exceptions to the Fourth Amendment prohibition on unreasonable seizures, any other seizure of any individual is deemed an arrest and "must be supported by the "long-prevailing standards" of probable cause."[198] "The requirement of probable cause has roots that are deep in our history,"[199] and represent the "best compromise"[200] between the opposing interests of protecting citizens from unreasonable interference with privacy and law enforcement's need for "fair leeway" when enforcing laws for the "community's protection."[201]

Not every police-citizen encounter is a seizure within the meaning of the Fourth Amendment. The variety and circumstances of police-citizen interactions are too numerous and varied to be listed or specifically defined. Courts must consider the particulars of each case while retaining "their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires."[202]

The Tenth Circuit recognizes three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by reasonable suspicion of criminal activity; and (3) arrest, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[203]

---

[197] *See Michigan v. Summers*, 452 U.S. 692, 699 (1981); *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975).

[198] *Dunaway*, 442 U.S. at 212 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

[199] *Henry v. United States*, 361 U.S. 98, 100 (1959).

[200] *Dunaway*, 442 U.S. at 208.

[201] *Id*.

[202] *Terry*, 392 U.S. at 15.

[203] *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010).

In evaluating whether a person has been seized, courts consider several factors, including:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.[204]

Of course, whether or not the individual was told by the officers he was free to leave is also relevant.[205] "No single factor is dispositive, and this list is not exhaustive."[206]

While not conclusive, the "strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred."[207] For example, in *Fuerschbach v. Southwest Airlines Co.*, a seizure occurred when an individual was confronted by two "uniformed and armed police officers, told of an outstanding arrest warrant, ordered to accompany the officers, and finally handcuffed and led forcibly toward an exit."[208] Under those conditions, a reasonable person would not have felt free to terminate the encounter with law enforcement officials.[209]

A detention can start out consensual or investigative and quickly transform into an arrest,[210] or the detention can effectively be an arrest from the outset, even if not labeled as such

---

[204] *Fox*, 600 F.3d at 1258 (citing *United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009)).  *See also United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012) (setting forth eight factors to consider when contemplating whether an individual has been seized).

[205] *Fox*, 600 F.3d at 1258.

[206] *Fox*, 600 F.3d at 1258 (citing *Rogers*, 556 F.3d at 1138).

[207] *United States v. Lopez*, 443 F.3d 1280, 1284-85 (10th Cir. 2006).

[208] *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006).

[209] *Id.*

[210] *See Florida v. Royer*, 460 U.S. 491, 502-03 (1983) (what began as consensual inquiry "escalated into investigatory procedure in a police interrogation room, where defendant was never informed he was free to leave, and as a practical matter, was under arrest).

by the police. "The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion . . . is termed an 'arrest' under state law."[211]

No bright-line rule exists to determine precisely when a police encounter transforms from something consensual or legitimately investigative to a *de facto* arrest. While the inquiry is case-specific, courts examine whether the investigative detention was "(1) justified at its inception, and (2) reasonably related in scope to the circumstances which justified the interference in the first place."[212] If the detention fails this two-prong test, the seizure "becomes an arrest that must be supported by probable cause,"[213] or consent.[214]

### Transportation Has Great Significance

In some instances, the police-citizen encounter exceeds the "permissible limits of those temporary seizures."[215] A "line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."[216] "Transportation of a defendant to the police station cannot be justified absent probable cause to believe the defendant committed a crime."[217] The Sixth Circuit has been clear: "officers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questions."[218] No Supreme Court case has "sustained against Fourth Amendment challenge the

---

[211] *Dunaway*, 442 U.S. at 212.

[212] *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (quoting *Terry*, 392 U.S. at 20).

[213] *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002); *Salas-Garcia*, 698 F.3d at 1248 (citing *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010)).

[214] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994).

[215] *Hayes v. Florida*, 470 U.S. 811, 815 (1985).

[216] *Hayes*, 470 U.S. at 816; *United States v. Gonzalez*, 763 F.2d 1127, 1133 (10th Cir. 1985).

[217] *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996).

[218] *United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000). *See also Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (taking individual to police station for questioning is "sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause").

involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization."[219]  When police, absent a warrant or probable cause, take an individual from his home and transport him to the police station, where briefly detained for investigative purposes, the seizure, "at least where not under judicial supervision, [is] sufficiently like [an] arrest[] to invoke the traditional rule that arrests may constitutionally be made only on probable cause."[220]

### Retention of Identification is Significant

In the context of a traffic stop, the Tenth Circuit applies a bright-line rule that a detention may not be deemed consensual unless the driver's documents have been returned to him.[221] Retention is significant if law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to ignore law enforcement requests and end the encounter.[222]  The encounter may become consensual if the officer returns the license and registration and asks questions without further constraining the person by an overbearing show of authority.[223]  While this case did not involve a traffic stop, Detective Pittman's retention of Javier's driver's license coupled with accusatory and coercive questioning would have conveyed to a reasonable person that he was not free to go.

### Length of Detention is Significant

The Supreme Court has stated that investigative detentions that are not based on probable cause must be supported by "reasonable suspicion" and must be "brief."  For example, *Terry v.*

---

[219] *Hayes*, 470 U.S. at 815.

[220] *Id*. at 816.

[221] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1309 & nn.7-8 (10th Cir. 2006) (collecting cases).

[222] *Id.* at 1309.

[223] *Id.* at 1308.

*Ohio*[224] "involved a brief, on-the spot stop on the street and a frisk for weapons."[225]  Similarly, other cases applying *Terry* approved only brief detentions.  In *United States v. Brignoni-Ponce*,[226] the Court approved brief stops by roving border patrol agents to check for illegal immigrants.  The stops usually lasted less than a minute and involved a brief question or two.[227]  Thus, the investigative detentions in *Terry* and *Brignoni-Ponce* were upheld because of the limited nature of the intrusion.[228]

In this case, Javier was not briefly detained, but was held for hours, under circumstances indistinguishable from an arrest.  The nature of the intrusion was great, and not "carefully tailored to the rationale justifying it."[229]

### Witness Status Is Not Significant

The Fourth Amendment's prohibition against unreasonable seizures applies whether the individual is deemed a suspect or a witness.  "Witness detentions are confined to the type of brief stops that interfere only minimally with liberty."[230]  When a "presumptive rule of unconstitutionality applies," as when police cross the threshold into an individual's home or place an individual in the back of a police car without consent, "probable cause remains a categorical requirement."[231]  To permit witnesses to be forcibly taken to the police station via a

---

[224] 392 U.S. 1.

[225] *Dunaway*, 442 U.S. at 209.

[226] 422 U.S. 873 (1975).

[227] *Dunaway*, 442 U.S. at 210-211.

[228] *Dunaway*, 442 U.S. at 211.

[229] *Dunaway*, 442 U.S. at 209 n.11.

[230] *Manzanares v. Higdon*, 575 F.3d 1135, 1145 (10th Cir. 2009) (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)).

[231] *Id*., 575 F.3d at 1145 (citing *Georgia v. Randolph*, 547 U.S. 103, 115 (2006)).

patrol car or the like "would stand the Fourth Amendment on its head."[232]  Exceptions to the requirement of warrants and probable cause must be "jealously and carefully drawn."[233]

### B.    Javier Mendoza-Trujillo Was Illegally Seized

Javier was seized in direct contravention of the Fourth Amendment when he was forced into the back of a police car for transport to the police station.  The Supreme Court has "never 'sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to the police station and his detention there for investigative purposes … absent probable cause or judicial intervention.'"[234]  As outlined below, Javier was involuntarily taken, via police car, to the police station without probable cause or judicial intervention.

Previously, Detective Pittman was asked to inform Javier that he "needed" to go back to the police station to be interviewed regarding the home invasion.[235]  Both Detectives Pittman and Stanworth testified that Javier "needed" to go to the police station to give statements and be interviewed.[236]  Although not given an opportunity or option to decline, Javier still asked the police if he had to go to the police station.[237]  Javier was told it was "necessary" for him to go to the station.[238]  Javier was not given the opportunity or option regarding when or where his interview would take place.  Javier was not given options as to how he would physically go from his house to the police station.

---

[232] *Id*. at 1146.

[233] *Randolph*, 547 U.S. at 109 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)).

[234] *Kaupp*, 538 U.S. at 630 (quoting *Hayes*, 470 U.S. at 815) (alteration in original); *cf. Payton v. New York*, 445 U.S. 573, 589-90 (1980).

[235] Transcript, p.39, lines 1-8.

[236] Transcript, p.29, lines 7-10, p.44, lines 2-6.

[237] Transcript, p.281, lines 22-25, p.282, line 1.

[238] Transcript, p.282, line 1.

Officer Cowan was responsible for taking Javier from his house to the police station.[239] Javier was placed in the back seat of Officer's Cowan patrol car, behind the cage,[240] where he had no door control.[241]

Prior to leaving the house, but after Javier had been locked in Officer Cowan's car,[242] Officer Cowan asked Javier if he had his driver's license with him.[243] Javier had nothing with him.[244] Javier was not allowed to go back inside his own house and retrieve his wallet or ID. Instead, Officer Cowan left Javier locked in the back of the patrol car, walked up to the house, asked another officer to find Javier's wallet and give it to him (Officer Cowan).[245] Then Officer Cowan drove Javier to the police station.

The record is devoid of any evidence suggesting the existence of probable cause at the time Javier was confined and transported. Javier's "detention was in important respects indistinguishable from a traditional arrest and therefore required probable cause or judicial intervention to be legal."[246] The officers' statements indicating that Javier had no choice but to go, confirm that no reasonable person would have believed that he was free to remain at home.

The seizure continued and was made even more severe once Javier arrived at the police station. When he first was delivered to the police station, Javier was escorted by Officer Cowan to the third floor break room.[247] Other detectives were present in the break room, ensuring Javier

---

[239] Transcript, p. 203, lines 20-21.

[240] Transcript, p.204, lines 11-16.

[241] Transcript, p.44, lines 2-6.

[242] Transcript, p.204, lines 11-23.

[243] Transcript, p.205, lines 1-4.

[244] Transcript, p.205, line 8.

[245] Transcript, p.205, lines 10-25, p.206, lines 1-3.

[246] *Kaupp*, 538 U.S. at 631.

[247] Transcript, p.206, lines 7-17, p.282, lines 10-13.

did not speak with his wife or his brother.[248]  At some time between 7:58am[249] and 9:07am,[250] police officers took Javier to an interview room.[251]  Other than Detective Pittman, no one came into the room with Javier.  Javier asked if he was being arrested and was told no.[252]  He asked if he was being detained, and was told he could leave when Detective Pittman was finished.[253]  The lack of a simple and straightforward answer, assuring Javier he was not under arrest or being detained, in response to such direct questions, unequivocally confirms that the only reasonable conclusion is that Javier was not free to leave.  Javier asked about going home to shower,[254] getting something to eat,[255] getting a drink of water,[256] and when photographs of his injuries would be taken.[257]  He was not in control of any of these basic needs.

As the Supreme Court noted in *Kaupp*, "[i]t cannot seriously be suggested that when the detectives began to question Kaupp, a reasonable person in his situation would have thought he was sitting in an interview room as a matter of choice, free to change his mind and go home to bed."[258]  A reasonable person in Javier's situation—prohibited from getting his own ID from his own house (which was then kept in the possession of police);[259] prohibited from going to the police station in his own vehicle; kept in a small, windowless interview room for several hours

---

[248] Transcript, p.128, lines 11-13, p.206, lines 18-26, p.207, lines 1-3.

[249] Transcript, p.310, line 11.

[250] Exhibit BB.

[251] Transcript, p.282, lines 14-16.

[252] Exhibit BB, p.34, lines 2-11.

[253] Exhibit BB, p.35, lines 9-14.

[254] Exhibit BB, p.46, lines 1-2.

[255] Exhibit BB, p.45, lines 8-11.

[256] Exhibit BB, p.44, lines 24-25.

[257] Exhibit BB, p.45, lines 1-6.

[258] *Kaupp*, 538 U.S. at 631.

[259] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308-09 (10th Cir. 2006) (bright-line rule that a stop *may not* be deemed consensual unless the driver's documentation, i.e., license and proof of insurance, have been returned). *See also Felders v. Bairett*, 885 F.Supp.2d 1191, 1201 (D. Utah 2012), *aff'd, Felders ex rel. Smedley v. Malcom*, 755 F.3d 870 (10th Cir. 2014).

without food or water; and escorted to and from the restroom – would not have thought it was all a matter of choice, and that he could change his mind at any time and go home. Detective Pittman never advised Javier that he could refuse to answer questions. Detective Pittman never told Javier that he could terminate the interview. Detective Pittman never told Javier that he was free to leave.[260] In fact, when Javier specifically asked if he was being detained, Detective Pittman actually confirmed that understanding, telling him "[o]nce we [are] finished talking, you can go back to your house."[261] Javier could have no other reasonable understanding than that he was being detained in police custody until he satisfactorily answered Detective Pittman's questions.

### The Seizure Was Not an Investigative Detention

An individual may not be "detained even momentarily without reasonable objective grounds for doing so."[262] While an individual may be subject to a brief investigative detention, the detaining officer must have "a reasonable suspicion that criminal activity may be afoot."[263] "Reasonable suspicion requires a particularized and objective basis for suspecting the person of criminal activity."[264] Furthermore, the "detention must be temporary, lasting no longer than necessary to effectuate the purpose, . . . and the scope of the detention must be carefully tailored to its underlying justification."[265]

In this case, police officers not only lacked probable cause, but also lacked the lower threshold of reasonable suspicion to detain Javier, even briefly, at the police station. When

---

[260] *See Fox*, 600 F.3d at 1258 (one factor suggestive of a non-consensual encounter is if the officer advised the individual he was free to leave).

[261] Exhibit AA, 11:07:14-18, 215262-215373, 01:59:43-46, Exhibit BB, p.35, lines 10-14.

[262] *Royer*, 460 U.S. at 298.

[263] *Fox,* 600 F.3d at 1259.

[264] *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (internal quotations omitted).

[265] *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997) (citing *Royer*, 460 U.S. at 500).

Javier was placed in the back of the police car, he was not a suspect in a crime.[266] He was viewed as a victim.[267] Detective Pittman, who interviewed not only Javier, but his wife Maria and his brother Ismael as well, did not have any information indicative of illegal or criminal activity by Javier until after Javier's home had been searched.[268] Detective Pittman testified that when the interviews began, he had no evidence to suggest the presence of illegal drugs.[269] Even after the preliminary interviews with not only Javier, but Ismael and Maria as well, Detective Pittman did not have any information that there were drugs or large amounts of currency in the house.[270] Rather, it was only after a search of Javier's house had been performed and Javier had been interrogated for a second time that Detective Pittman had any indication of criminal activity being afoot.[271]

No Supreme Court case has sanctioned "the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes … absent probable cause or judicial authorization."[272] "[S]uch seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause."[273]

The length of time that Javier was detained further supports the finding of an unlawful seizure rather than an investigative detention. Similar to the instant matter, in *Leveto v.*

---

[266] Transcript, p.25, lines 8-10.

[267] Transcript, p.25, lines 13, 18, p.43, line 8, p.118, lines 11-15.

[268] Transcript, p.136, lines 6-17.

[269] Transcript, p.135, lines 9-12, 25, p.136, lines 1-5, p.137, lines 3-4.

[270] Transcript, p.136, lines 6-11.

[271] Transcript, p.136, lines 12-17.

[272] *Kaupp,* 538 U.S. at 630 (alteration in original) (quoting *Hayes*, 470 U.S. at 815). *See also Royer*, 460 U.S. at 499 (police may not "seek to verify their suspicions by means that approach the conditions of arrest"); *Hayes*, 470 U.S. at 816 (police procedures are so intrusive as to trigger the full protection of the Fourth Amendment when police, absent probable cause or a warrant, transport an individual to the police station where he is detained, however briefly, for investigative purposes).

[273] *Hayes*, 470 U.S. at 816.

*Lapina*,[274] the plaintiff was detained for a total of eight hours, during which he was "restricted in communicating with others."[275]  For a six-hour period, the plaintiff was subjected to interrogation by federal agents.[276]  Though the Supreme Court has not declared a fixed time after which a detention becomes prolonged, an "eight-hour detention undoubtedly qualifies as prolonged under any reasonable understanding of that term."[277]  Perhaps more offensive to the Third Circuit was the fact that the detention "did little to advance the law enforcement interests"[278] that would justify detention like preventing flight if incriminating evidence was found or minimizing risk of harm to an officer.[279]

Here, Javier was held in custody for a minimum of seven hours.  He was taken into custody at approximately 7:40 a.m., and then held isolated in a small interview room where he was interrogated for nearly six hours.  No members of the public were in the interview room.  No other police officers were in the interview room.[280]  Though moved from the interview room to the forensics area, Javier was still restrained from talking to anyone other than Detective Pittman.  In fact, Detective Pittman continued interrogating Javier until taking him to the victim advocate's office—nearly seven hours following Javier's initial arrest.

The interview began in an accusatory nature, as Detective Pittman told Javier "Don't give me lies"[281] and continued with "accusatory, persistent, and intrusive" questions and

---

[274] *Leveto v. Lapina*, 258 F.3d 156, 169 (3rd Cir. 2001)

[275] *Id*.

[276] *Id*.

[277] *Id*.

[278] *Id*. at 170.

[279] *Id*. at 167.

[280] *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) (citing *Bostick*, 501 U.S. at 437).

[281] Exhibit AA, 10:33:21, 154326, 01:25:50; Exhibit BB, p.3, lines 1-2.

statements.[282]  Detective Pittman repeatedly warned Javier to not give lies,[283] and to tell the truth.[284]  Detective Pittman spent a great deal of time telling Javier there is always a reason for armed assailants to breach the privacy and security of an individual's home.[285]  Detective Pittman used aggressive language and persisted in his demands for the truth while continually insinuating Javier was involved in illegal activity.[286]  For example, within the first forty minutes of the interview, Detection Pittman mentioned "drugs" seven times[287] and "money" twelve times.[288]

Based upon the totality of the circumstances, including Detective Pittman's unequivocal lack of probable cause, the extreme length of time Javier was detained, the conditions of Javier's detention (isolated from the public, subjected to aggressive and persistent interrogation, and deprived of food), and the lack of law enforcement interests served by the detention, it is clear Javier was unlawfully seized, and not in an investigative detention, until being left at the victim advocate's office.

## II.       No Break in the Chain of Events Validates the Consent Forms

Javier was subjected to a warrantless arrest without probable cause and therefore seized in direct contravention of the Fourth Amendment.  The illegal seizure continued for several more hours after Javier arrived at the police station.

---

[282] Exhibit BB, p.28, lines 15-16, p.29, lines 24-25, p.30, lines 7-9, p.31, line 9.

[283] Exhibit BB, p.3, lines 1-2,

[284] Exhibit BB, p.28, lines 15-16, p.29, lines 24-25, p.30, lines 7-9, p.31, line 9.

[285] *See United States v. Little*, 862 F.Supp. 334, 335 (D.N.M. 1994) 437 (accusatory, persistent and intrusive questioning can turn a voluntarily police-citizen encounter into one that is coercive making responses to police inquiries required, not optional) (citing *Bostick*, 501 U.S. 429), aff'd *United States v. Little*, 60 F.3d at 712..

[286] Exhibit BB, p.27, lines 14-15, p.29, lines 24-25, p.35, lines 22-23.

[287] Exhibit BB, p.28, lines 8-9, p.32, line 18, p.35, line 16, p.37, line25, p.38, lines 3, 5.

[288] Exhibit BB, p.28, lines 6, 11, p.30, lines 16, 21, p.31, lines 7, 22, p.32, lines 7, 10, p.35, line 17, p.37, line 25, p.38, lines 3, 5.

The next question is whether, in light of the unconstitutional seizure, any consents to search or any statements given by Javier were sufficiently purged of the taint of the illegal seizure. If the consents or statements were not sufficiently purged of the taint of illegality, any evidence obtained as a result of the searches must be suppressed as fruit of the poisonous tree.[289] The government does not claim that such an attenuation occurred. But the issue will be examined to complete the analysis.

"It is settled law that a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint."[290] "Mere submission to lawful authority does not equate to consent, rather valid consent must be unequivocal and specific, and freely and intelligently given."[291]

When an individual is illegally detained or arrested, any evidence flowing from the unlawful seizure *must* be suppressed unless obtained via an "act of free will [sufficient] to purge the primary taint of the unlawful invasion."[292] Thus, the inquiry is whether the consents to search were sufficiently acts of "free will to purge the primary taint,"[293] of the illegal seizure.

The government bears the burden of proof to establish that there was a "break in the causal connection between the illegality and evidence thereby obtained" and that "consent was voluntary under the totality of the circumstances."[294] While establishing a break in the causal connection is fact-intensive and case-specific, the "Supreme Court [has] articulated three factors

[289] *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

[290] *Oregon v. Elstad*, 470 U.S. 298, 306 (quoting *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)).

[291] *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) (citing *Royer*, 460 U.S. at 497).

[292] *Kaupp*, 538 U.S. at 632 (quoting *Wong Sun*, 371 U.S. at 486).

[293] *Brown v. Illinois*, 422 U.S 590, 602, (1975) (quoting *Wong Sun,* 371 U.S. at 486).

[294] *Fox*, 600 F.3d at 1257 (quoting *Melendez-Garcia*, 28 F.3d at 1054).

especially relevant to this inquiry: (1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances, and . . . (3) the purpose and flagrancy of the official misconduct."[295]

### A.  The Consents to Search Were Executed in the Same Time Frame as the Illegal Seizure

By the time Javier signed the first consent to search form at 1133,[296] more than six hours had passed since his home was invaded by armed assailants.  It had been six hours since police first arrived at Javier's house.  Three-and-a-half hours had elapsed since Javier had been involuntarily removed from his house and taken via police car to the police station.  Nearly two-and-a-half hours had gone by since Javier had been isolated in a small interview room.  Detective Pittman had been talking to Javier for an hour.

### B.  No Circumstance Intervened Between the Illegal Seizure and the Consent Form Signatures

As succinctly set forth in the preceding paragraph, the facts do not evidence any intervening circumstance or attenuation between when Javier was illegally arrested and when he signed the first consent to search form.  Nothing happened to "create a discontinuity between the illegal seizure and the consent such that the original illegality [was] weakened and attenuated."[297]

In some cases, carefully explaining a consent form and advising an individual of the right to withhold consent may create an intervening circumstance.[298]  However, this did not occur in the present case.  Despite a lengthy conversation about cell phones and why Detective Pittman

---

[295] *Fox*, 600 F.3d at 1259-60, (quoting *Melendez-Garcia*, 28 F.3d at 1054); *Brown v. Illinois*, 422 U.S. at 603-04.

[296] Exhibit 1.

[297] *Fox*, 600 F.3d at 1260 (quoting *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996)).

[298] *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1012 (10th Cir. 1992) (in addition to many other events creating attenuation, officers carefully explained the consent to search form in suspect's native language as well as advising her of her right to withhold consent).

may have wanted to search Javier's cell phone,[299] Detective Pittman did not explain (in any language) the consent to search form to Javier.  Instead, Detective Pittman instructed Javier where to put his name, date of birth, and signature.[300]  The only time Detective Pittman suggested that Javier could withhold consent was early on in the conversation about cell phones,[301] thirty minutes before the actual consent to search form was presented.  Based on the facts and the record, no attenuation or intervening circumstance occurred to remove the taint of the illegal arrest.

### C.  The Purpose and Flagrancy of the Official Misconduct Show No Break

The purpose and flagrancy of the official misconduct is the last factor in determining whether a break exists.  "[P]urposeful and flagrant misconduct is generally found where: '(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope something might turn up.'"[302]

Detective Pittman claimed that when he began his interviews, "there was no speculation of drugs.  [He] was trying to find a reason why these people did what they did to Javier and his family."[303]  The following excerpt of Detective Pittman's testimony demonstrates his proclaimed lack of investigation of Javier:

Q.    So you thought the home invasion robbery might be connected to some other crime; is that right; when you began interviewing all of the adult witnesses?
A     No.

. . . .

---

[299] Exhibit BB, pp.32-41.

[300] Exhibit BB, p.41, lines 9-11.

[301] Exhibit BB, p.33, lines 23-24.

[302] *Fox*, 600 F.3d at 1261 (quoting *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006)) (internal quotation marks omitted).

[303] Transcript, p.137, lines 2-5.

> Q. You're just trying to figure out, but you can't look to anything specifically and say, hey, there's a reason why I believe that there is some other crime or activity going on in this home.
>
> A. I had no idea what was going on and why they picked that house.
>
> Q. Okay. And based on the interviews that you conducted with all of the three adult individuals at the station you didn't get any information that there was drugs or a large amount of currency in the home; correct?
>
> A. No. Until later on. In the preliminary interviews, no.
>
> Q. Until later on, until a search was done at the home.
>
> A. Yeah. Until I talked to Javier the second time.
>
> Q. And that was after a search had been done at the home.
>
> A. Correct.[304]

Detective Pittman's admitted lack of reasonable suspicion of criminal activity, coupled with the illegal arrest, leads to the inescapable conclusion that Detective Pittman was on a "fishing expedition in the hope that something might turn up."[305]

But Detective Pittman's testimony also shows that he was suspicious of criminal activity – without any articulable basis – from the start. Detective Pittman refused to believe this was simply a random home robbery, stating his personal belief that the armed assailant "was looking for something."[306] After listing possible reasons why Javier's residence was targeted, Detective Pittman expressed his disbelief in Javier's version,[307] telling Javier "I just want to know the truth. Why were they there? And I know you know why they were there."[308] Detective Pittman held fast to his belief that Javier was lying, yelling at Javier to "[t]ell me the truth!"[309] Javier's response was equally as vehement "That is the truth!"[310] Later, Detective Pittman claimed,

---

[304] Transcript, p. 135, lines 9-12, 25, p.136, lines 1-17.

[305] *Fox*, 600 F.3d at 1262 (quoting *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994)).

[306] Exhibit AA, 10:57:37-58:01, 197970-198692, 1:50:06-30; Exhibit BB, p.27, lines 12-13.

[307] Exhibit AA, 10:59:45, 201810, 01:52:14; Exhibit BB, p.28, line 22.

[308] Exhibit AA, 10:59:34-68, 501464-589, 1:52:02-07; Exhibit BB, p.28, lines 15-17. See also Exhibit BB, p.29, lines 21-24, p.30, lines 9-10.

[309] Exhibit AA, 11:01:53-56, 205637-748, 01:54:22-25; Exhibit BB, p.30, line 9, p.31, line 9.

[310] Exhibit AA, 11:01:53-56, 205637-748, 01:54:22-25; Exhibit BB, p.30, line 10, p.31, line 10.

based on his experience, "every investigation that I have done [it was] about drugs or money, every one."[311]  Pressing Javier, Detective Pittman repeated "I want to know why these guys were there."[312]  Javier repeated "I don't know."[313]

Detective Pittman's conduct in detaining Javier for no articulable reason is flagrant, as are his inconsistent explanations of a lack of investigative purpose directed at Javier and a belief that drugs were involved.

### Summary

The facts demonstrate that no causal break or attenuation existed between Javier's illegal arrest and when Javier signed all four of the consents to search.  There were no intervening circumstances to separate Javier's illegal seizure from his signing of any of the consents to search.  Finally, in all four situations, Detective Pittman's questions constituted purposeful and flagrant misconduct, designed to coerce Javier into signing the consent forms.[314]  Necessarily, the Court finds that all four of the consents to search were not purged of the taint of the illegal seizure.  Because Javier's consents were not purged of the taint of his illegal arrest, any and all evidence obtained as a result of the four consents to search must be suppressed.

## III.    Examined Independently of the Seizure, the Consents Were Not Voluntary

Even if the prolonged detention of Javier did not invalidate the consents, an independent examination of the circumstances surrounding the consent forms shows that consent was involuntary.

---

[311] Exhibit AA, 11:12:11, 224175, 02:04:40; Exhibit BB, p.38, lines 4-5.

[312] Exhibit AA, 11:12:44, 225169, 02:05:13; Exhibit BB, p. 38, lines 12-13.

[313] Exhibit AA, 11:12:48, 225265, 02:05:17; Exhibit BB, p.38, line 14.

[314] *Fox*, 600 F.3d at 1261-63.

The government's recitation of factors to be considered when evaluating the voluntariness of consent is correct.[315]  Factors to be considered include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons.  Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent are also factors to consider in determining whether consent given was voluntary under the totality of the circumstances.[316]

The government also correctly suggests that relevant factors may include the length of detention and questioning, the extent of the suspect's cooperation with police, and the suspect's belief that no incriminating evidence will be found.[317]

## A.      Javier Was Not Informed of His Right to Refuse Consent

The record does not support a finding that Javier was informed of his right to refuse consent to the search of his house.  The video record does not show this right was ever explained to him except briefly very early in the interrogation.  When the first consent to search the cell phone was discussed, thirty minutes before the form was signed, Detective Pittman said "You can say no."[318]  No such discussion occurred when the first consent form was presented and no such discussion occurred at the time any other form was discussed or presented on the video.  The fourth consent form was signed with no video record.  Detective Pittman testified that on this fourth form he explained the right to withhold consent.

> A      But I did explain to him to the best of my ability in Spanish that he could tell us no, that this was a consent. It was his own free will giving us permission to enter the residence, and he could tell us no.
> Q.      And after that explanation he signed the consent?

---

[315] Government's Proposed Findings, p. 6.

[316] *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012); Government's Proposed Findings, p.6.

[317] Government's Proposed Findings, p. 6.

[318] Exhibit BB, p. 33, lines 23-25.

A.       Yes, he did.[319]

Except for the first consent to search, Javier was never told he could refuse consent – and the circumstances surrounding the first consent do not clearly demonstrate Javier was informed he could withhold consent as it pertained to the search of his cell phone. In light of the failure to adequately explain the right to withhold consent in the three prior videotaped discussions of the form, Detective Pittman's testimony that he explained this right in the one other instance is not credible.  He is likely recalling his few words said early in the discussion about the first form. He embellishes, however, in this instance saying that he also informed Javier that this was a consent, and that it was his own free will.  This is more than he explained in the first video-taped instance, and striking in the absence of any explanation of a right to consent when the second and third consent forms were presented, explained and signed.

The government suggests that the consent to search form contains clear and unequivocal language stating that the subject has a constitutional right to refuse permission to search.  But the form is in English.  At the hearing, the government elicited the following testimony from Javier:

Q:       Do you read some English?
A:       No.
Q:       None?
A:       I understand a little, but no, no.[320]

The language in the form cannot be relied on to show Javier knew his right to withhold consent to search.  Without an explanation of the right to refuse to consent, and any comprehension of the form language, Javier did not know he could refuse to consent.

---

[319] Transcript, p. 81, lines 18-23.

[320] Transcript, p.287, lines 4-7.

### B. Javier Was Not Generally Cooperative

The government contends further evidence of voluntariness is that Javier was generally cooperative with police.[321]  The record, however, is devoid of any suggestion that Javier's compliance with a police directive "was anything more than a mere submission to a claim of lawful authority."[322]  Javier was given no choice about transportation to the police station in the locked portion of a patrol car, detention in an interview room even when not being interviewed, controlled access to the bathroom, restriction from access to food and water, isolation from his family members, and continued interrogation for many hours.  Thus for a lengthy time  until he was formally arrested, he had no unrestrained choices.

### C. Coercive Tactics Were Used

While the government contends no coercive tactics were used, Detective Pittman used many of the psychologically coercive tactics identified in *Miranda*:

> taking an individual out of his home and removing him to an unfamiliar and isolated location;[323]

> patient and persistent, and at times, relentless questioning; and[324]

> offering legal excuses for his actions to eventually obtain an admission of guilt.[325]

One example of Detective Pittman's conduct from Javier's illegal seizure and interrogation highlights this latter technique:

> "They were waiting for you.  I want to know why.  Wait.  When something like this happens, they happen for a reason.  They are not just band members that are passing by a house and they say, "Hey, let's go rob this house."
> This is not what happened.  Okay.  I believe they were looking for something because when this guy came in the house, he went directly to your bedroom, your wife's

---

[321] Government's Proposed Findings. P. 9.

[322] *Kaupp*, 538 U.S. at 631 (quoting *Royer*, 460 U.S. at 497).

[323] *Miranda v. Arizona*, 384 U.S 436, 449-50 (1966).

[324] *Miranda*, 384 U.S. at 451-52, 455.

[325] *Miranda*, 384 U.S. at 451-52.

and your bedroom. He was looking for something. He believed there was something inside house. I don't know what you guys do. I am not going to investigate if you do something illegal."[326]

This type of questioning occurred throughout the multiple hours Javier was detained at the police station.[327]

### D.    Other Factors Do Not Suggest Consent

The government is, however, correct in asserting there was no use or display of force; that Javier Mendoza-Trujillo did not display intellectual or educational deficiencies; and in claiming the neutrality of whether Javier believed incriminating evidence would be found.

However, even if the consents were sufficiently purged of the taint of the illegal arrest, a finding of voluntariness would not be supported. Javier was not informed of his right to refuse consent. Javier was not given the opportunity to read the consent to search form, in English or Spanish. There is no indication Javier was independently cooperative with police; rather the record supports a finding that Javier was merely complying with what he thought was a lawful directive. The length of Javier's illegal arrest and ensuing custodial interrogation was excessive. Coercive tactics were used throughout the entirety of Javier's prolonged, unlawful seizure. The facts that Javier seemed to possess his mental faculties, the interview was conducted in Spanish, and Detective Pittman did not make a show of force do not outweigh these factors which show that Javier's consent was not voluntary.

---

[326] Exhibit BB, p.27, lines 4-15.

[327] Exhibit BB, pp.28-29, pp.34-35, pp. 36-38.

## CONCLUSION

Javier Mendoza-Trujillo was subjected to an illegal, warrantless arrest that violated his Fourth Amendment right to be free from unreasonable searches and seizures. The police lacked probable cause or judicial intervention in the form of a warrant when they transported Javier away from his home to the police station in the back of a patrol car. If not at the time of transport, the seizure clearly became illegal when he was controlled, isolated and retained for such a long period of time in a transparent attempt to obtain evidence of his criminal activity without a basis for his detention.

While illegally detained, Javier signed four discrete consents to search. The only way the fruits of such searches would be admissible is if the government first shows a sufficient attenuation or break in the causal connection between the illegal detention and the arrest, and then that consent was voluntary.[328] No causal break or attenuation occurred between Javier's illegal seizure and when Javier signed all four consents to search. All four of the consent to search forms are tainted by the illegality of Javier's arrest and ensuing detention.

---

[328] *Fox*, 600 F.3d at 1259.

Further, when examined apart from the seizure, the consents were not signed voluntarily. Accordingly, any and all evidence obtained as a result of the unlawful detention and arrest of Javier and the resultant consents is and shall be suppressed. Defendant's Amended Motion to Suppress[329] is GRANTED.

DATED this 2nd day of September, 2014.

BY THE COURT:

_____

DAVID NUFFER
United States District Court Judge

---

[329] Docket no. 41, filed May 12, 2014.